**LOGAN PRODUCTIONS, INC.,**
**Plaintiff–Appellant,**

v.

**OPTIBASE, INC., Defendant–Appellee.**

No. 96–1871.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1996.

Decided Dec. 19, 1996.

Robert F. Johnson and Alexander T. Pendleton (argued), Cook & Franke, Milwaukee, WI, for Plaintiff–Appellant.

John E. Flanagan (argued) and David A. Krutz, Michael, Best & Friedrich, Milwaukee, WI, for Defendant–Appellee.

Before POSNER, Chief Judge, and FLAUM and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Jim and Beth Logan own Logan Productions, a small Milwaukee company which sells computer systems and creates video productions. In 1994 Logan Productions purchased a compact disc encoding machine to enable the company to create interactive compact disc productions. When the machine didn't perform up to par, Logan Productions sued the machine's manufacturer, Optibase, in Wisconsin state court. Optibase, a California corporation with its principal place of business in Texas, removed the case to federal court, where the district court dismissed the suit for lack of personal jurisdiction. Logan Productions, left without a Wisconsin forum for its suit, appeals.

In 1993 Jim Logan took a break from the cold weather and grey skies of Milwaukee in November and hopped a flight to Las Vegas. However, instead of scrounging for tickets to see a hot show at Caesar's Palace or trying his luck with the slots or skills at blackjack, Logan spent his time at COMDEX, the largest computer trade show in the country. Like each of the over 100,000 visitors attending the show, Logan wore a credit card-like identification badge which had his name and address encoded on it. Optibase, who manufactures a line of encoding machines used for transferring videos onto compact discs, was among the thousands of exhibitors peddling their wares at COMDEX. When Logan stopped to chat at Optibase's booth, Optibase's employees scanned his badge and Logan's name wound up on Optibase's mailing list.

About a month later, a customer asked Logan Productions to create an interactive compact disc production. Because Logan Productions didn't have the equipment necessary to perform the encoding work, Logan looked into farming out that part of the job. It must have been fate: while Logan was still looking into where he could send the work, he received a letter from Optibase. The letter began with the greeting, "Dear Multimedia Developer," thanked the reader for stopping by Optibase's booth at COMDEX, and stated, "We want your business and know how to earn it!" A glossy promotional flyer pitching Optibase's products—including machines which could perform Logan's encoding work—accompanied the letter.

After one of the machines described in the flyer, the Lab Pro, caught Logan's eye, he reached out and touched Optibase's central region sales manager, Steve Unger. Three months of off-and-on correspondence followed. At a minimum, Unger called Logan three times, mailed him information, and faxed him the machine's specs. Logan later met Unger in Dallas to learn more about the Lab Pro. During these discussions Unger suggested that Logan become the first on his block to sign on as an Optibase distributor. In March 1994 Logan finally agreed to buy a Lab Pro for $15,600—the distributor's price. Optibase shipped the machine to Wisconsin and later sent Logan software updates and a promotional newsletter.

The sale to Logan was not Optibase's only contact with Wisconsin. By March 1994 Optibase was advertising in several national trade publications with Wisconsin subscribers and had made at least four other sales in the Badger State totaling over $22,000. In the months that followed, Optibase stepped up its advertising in the trade magazines and sent promotional newsletters to 144 people in Wisconsin. In September 1994 Optibase signed a Milwaukee-based distributor, Video Images, to market its products in Wisconsin and Illinois. In February 1995 Optibase sent Unger and another employee to Wisconsin to conduct dealer training. By April 1995 Opti-

base had at least a dozen customers in Wisconsin, whose purchases accounted for 1.88 percent of Optibase's nationwide sales through 1994 and 1.11 percent through 1995.

Meanwhile, all was not well in Milwaukee. According to Logan, the Lab Pro was a dud. Logan claims that the machine could not handle tasks Optibase assured him would be a piece of cake. As a result, Logan sued Optibase in state court in September 1994, alleging breach of contract, common law fraud, and consumer fraud under Wisconsin Statute § 100.18. A month later the case was removed to district court, where Optibase moved to dismiss based on a lack of personal jurisdiction. Optibase conceded it fell within the grasp of the Wisconsin long-arm statute, but claimed Wisconsin could not exercise jurisdiction without violating the Due Process Clause of the Fourteenth Amendment of the federal Constitution. The district court agreed with Optibase and dismissed the case.

■ We review the district court's decision to dismiss Logan's claim for lack of personal jurisdiction *de novo, Klump v. Duffus,* 71 F.3d 1368, 1371 (7th Cir.1995), *cert. denied* —— U.S. ——, 116 S.Ct. 2523, 135 L.Ed.2d 1047 (1996), and because this is a diversity case, our task is to determine whether Wisconsin, the forum state, could exercise personal jurisdiction over Optibase. *Giotis v. Apollo of the Ozarks, Inc.,* 800 F.2d 660, 664 (7th Cir.1986), *cert. denied* 479 U.S. 1092, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987). Because the case was dismissed without an evidentiary hearing, we also must resolve all relevant factual disputes in Logan's favor. *Turnock v. Cope,* 816 F.2d 332, 333 (7th Cir.1987).

■ Wisconsin can exercise two types of personal jurisdiction over a nonresident defendant, general and specific. General jurisdiction is proper when a defendant has "continuous and systematic business contacts" with a state and it allows a defendant to be sued in that state regardless of the subject matter of the lawsuit. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984). On the other hand, a state may exercise specific jurisdiction when the defendant has a lesser degree of contact with the

state, but the litigation arises out of or is related to those contacts. *Id.* at 414 n. 8, 104 S.Ct. at 1872 n. 8. This is a specific jurisdiction case.

■ Under Wisconsin law, Logan must first make a prima facie case of specific jurisdiction by showing that Optibase falls within the grasp of Wisconsin's long-arm statute. Then, because Wisconsin presumes its long-arm statute merely codifies the federal due process requirements, *Lincoln v. Seawright,* 104 Wis.2d 4, 10, 310 N.W.2d 596, 599 (1981), the burden switches to Optibase to show that jurisdiction would nonetheless violate due process. *Marsh v. Farm Bureau Mut. Ins. Co.,* 179 Wis.2d 42, 53, 505 N.W.2d 162, 166 (Ct.App.1993). Because Optibase concedes it is covered by Wisconsin's long-arm statute, we need only address the constitutional issue.

■ In order for Wisconsin to constitutionally exercise specific personal jurisdiction in this case, Optibase must have minimum contacts with Wisconsin. *Id.* (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Optibase must have established these contacts by purposefully availing itself of the privilege of doing business in Wisconsin. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). The purposeful availment requirement is designed to prevent defendants from being hailed into court solely as a result of "random," "fortuitous," or "attenuated" contacts with the forum state. *Id.* (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984)). Then, if minimum contacts exist, we must determine whether jurisdiction would be consistent with traditional notions of fair play and substantial justice. *Id.* at 476, 105 S.Ct. at 2184.

The district court found Logan initiated the purchase of the Lab Pro and concluded that Optibase never purposefully availed itself of doing business in Wisconsin. The court reasoned that because Logan approached Optibase's booth at COMDEX, "Optibase did not seek to sell to Logan; rather, Logan sought to buy from Optibase."

On the other hand, Logan claims that Optibase initiated the transaction. After all, Logan says, Optibase sent him a solicitation letter letting him know that Optibase wanted his business and knew how to earn it. Logan also argues that even if we find that the transaction kicked off at COMDEX, Optibase's employees initiated the deal by asking to electronically scan the information on his convention badge.

■ It would seem, then, we face a dilemma similar to one sometimes encountered by parents with small children-which child to believe when both claim the other started the argument. However, the constitutionality of jurisdiction does not turn on which party "started it." Rather, pinning down which party initiated the transaction is merely one helpful factor in the jurisdictional equation. *See Madison Consulting Group v. South Carolina*, 752 F.2d 1193, 1202 (7th Cir.1985). For no matter which party got the ball rolling, if Optibase intentionally served the Wisconsin market, Optibase purposefully established sufficient minimum contacts to subject it to personal jurisdiction in Wisconsin.

■ So, did Optibase intentionally serve the Wisconsin market? To answer that question, we need to examine Optibase's contacts with Wisconsin. Optibase argues that because this is a specific jurisdiction case, only those contacts directly arising out of its deal with Logan—a few phone calls and a few mailings—are relevant to our inquiry. The bulk of its contacts, Optibase says, are off limits for our purposes. Our focus is not that narrow. Instead, we consider the overall relationship between Optibase, Wisconsin, and the litigation. *Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1244 (7th Cir.1990), *cert. denied* 499 U.S. 947, 111 S.Ct. 1415, 113 L.Ed.2d 468 (1991). In looking at that relationship, we recognize that Optibase's additional contacts with Wisconsin— including ties forged after it sold the Lab Pro to Logan—are relevant when determining whether Optibase intended to serve the Wisconsin market. *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947–48 (1992) (additional contacts—including those established after the plaintiff's injury—revealed the defendant's intent to serve the forum state's mar-

ket); *Daniel J. Hartwig Assocs., Inc. v. Kanner*, 913 F.2d 1213, 1219 (7th Cir.1990) (considering all of the defendant's contacts with Wisconsin). *See also Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 106, 107 S.Ct. 1026, 1029, 94 L.Ed.2d 92 (1987) (considering total sales of product within the forum state in the 4 years following the sale giving rise to the plaintiff's injury).

Optibase's Wisconsin contacts clearly signal an intent to do business in the Badger State. For example, Optibase advertised in trade magazines circulated in Wisconsin, sent out 144 newsletters to Wisconsin residents, sold its products to at least a dozen Wisconsinites, signed up a Wisconsin distributor; and once conducted dealer training in Wisconsin. Optibase was not some little mom and pop retailer who passively sold only to those out-of-staters who happened to wander into its shop down in Dallas. Rather, Optibase was a manufacturer who in its own words "wanted the business" of Wisconsin residents "and knew how to earn it!" As a result, we do not hesitate to conclude that Optibase purposefully established minimum contacts with Wisconsin.

Once minimum contacts have been established, Optibase can only escape jurisdiction by making a "compelling case" that forcing it to litigate in Wisconsin would violate traditional notions of fair play and substantial justice. *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184–85. Factors Wisconsin courts would consider when assessing whether jurisdiction is consistent with fair play and substantial justice include: the burden on Optibase, Wisconsin's interest in adjudicating the dispute, Logan's interest in obtaining convenient and effective relief, the interstate judicial system's interest in resolving the dispute in the most efficient manner, and the shared interest of the several states in furthering fundamental social policy. *Marsh*, 179 Wis.2d at 57, 505 N.W.2d at 167 (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980); *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184–85; *Asahi*, 480 U.S. at 113, 107 S.Ct. at 1033).

 Optibase argues it would make more sense to resolve this dispute in California (a Los Angeles forum selection provision, the enforceability of which we do not consider, is lurking in small print under a "miscellaneous" heading in the license agreement on the Lab Pro machine) and we should give less weight to Logan's convenience because Logan has suffered only economic harm. Optibase's arguments fall far short of a compelling case. First, although it's always burdensome to defend a lawsuit away from home, Optibase has not been asked to shoulder a burden so heavy as to violate the Constitution. After all, "it usually will not be unfair" to subject a defendant who engages in economic activity in a state to the burdens of litigating in that state. *Burger King*, 471 U.S. at 474, 105 S.Ct. at 2183. Optibase is no stranger to Wisconsin; two of its employees have traveled the route to Wisconsin before, it has a dozen customers and a distributor there, and it advertised in the state. Second, Wisconsin has a definite interest in adjudicating this dispute. *See Madison Consulting*, 752 F.2d at 1209 ("Wisconsin has a compelling interest in offering its residents legal avenues for enforcing contracts with nonresidents"); *Wisconsin v. Advance Mktg. Consultants, Inc.*, 66 Wis.2d 706, 719, 225 N.W.2d 887, 894 (1975) ("It is obvious that the state of Wisconsin has ... a definite interest in providing a forum" in which Wisconsin residents can sue nonresidents for consumer fraud under § 100.18). Third, Logan has an interest in obtaining convenient and effective relief. Logan Productions is a small company with only two full-time employees other than Jim and Beth Logan. Additionally, the two cases Optibase cites for its notion that we should downplay Logan Productions' interest in obtaining convenient relief because only its pocketbook took a hit both involved situations in which *sellers* (like Optibase) were attempting to drag buyers (like Logan) into distant forums (like California). *See Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co.*, 18 F.3d 389 (7th Cir.1994) (insurer suing insured); *Lakeside Bridge & Steel Co. v. Mountain State Constr. Co.*, 597 F.2d 596 (7th Cir.1979), *cert. denied*, 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980) (seller suing buyer). Finally, it seems more efficient to litigate this dispute in Wisconsin than in California. Although Optibase is indeed incorporated in California, it has only one employee in that state and none of the potential witnesses reside there. In contrast, the record reveals that at least 9 of the 15 potential witnesses in this case are Wisconsin residents. As a result, we find that Optibase has not made a compelling case that subjecting it to jurisdiction in Wisconsin violates traditional notions of fair play and substantial justice.

For these reasons, we conclude that the Due Process Clause of the Fourteenth Amendment does not preclude Wisconsin from exercising personal jurisdiction over Optibase. It follows, then, that the decision of the district court must be REVERSED and the case REMANDED to it for further proceedings.