BRANDON APPAREL GROUP, INC., Plaintiff,

v.

QUITMAN MANUFACTURING COMPANY INC., Defendant.

No. 98 C 7146.

United States District Court, N.D. Illinois, Eastern Division.

March 18, 1999.

Donald Kroyer Sylvanus Petersen, Petersen & Lefkofsky, P.C., Bloomfield Hills, MI, John A. Sopuch, III, J. Jeffrey Nouhan, Sopuch, Nouhan, Higgins & Arnett, LLP, Chicago, IL, for plaintiff.

Shayle P. Fox, John T. Martin, Fox and Grove, Chartered, Chicago, IL, David E. Mullis, Smith & Mullis, Valdosta, GA, for defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Before the court is defendant Quitman Manufacturing Company, Inc.'s motion (1) to dismiss for lack of personal jurisdiction; (2) to dismiss for improper venue; or, alternatively, (3) to transfer venue. For the following reasons, the court denies defendant's motion in full.

### I. BACKGROUND

Plaintiff Brandon Apparel Group, Inc. ("Brandon") is a Delaware corporation that has its corporate headquarters and principal place of business in Chicago, Illinois. Defendant Quitman Manufacturing Company, Inc. ("Quitman") is a Georgia corporation that has its principal place of business in Georgia. Brandon is a manufacturer and distributor of licensed apparel that is embroidered with the logos of various athletic teams. Brandon purchases blank garments from companies such as Quitman, embroiders the logos on the garments, and then sells the garments to its customers, which include major retail department stores. Brandon also purchases fully embroidered garments from companies such as Quitman and then packages and sells these garments to its customers.

In October or November of 1997, Suzanne Anderson of Brandon sent Quitman a letter, asking whether Quitman would be available to cut and sew garments for Brandon. In response to the letter, Bruce Feinberg ("Bruce"), who is President of Quitman, contacted Anderson and told her that Quitman was not interested in being a

contractor for Brandon but was interested in producing finished product for Brandon. Bruce asked Anderson to send him information so that he could provide a price quote. Anderson sent the requested information and asked Bruce to advise her as to what Quitman's best F.O.B. price was. On January 7, 1998, Bruce sent a letter to Anderson in Chicago stating Quitman's best price for the garments.

After sending the letter and before March 4, 1998, Bruce tried calling Anderson, but she never returned his calls. During this time, Bruce spoke with Steve Everhart, who is associated with another apparel manufacturer and who spoke periodically with Brad Keywell ("Keywell"), who is the President of Brandon. Bruce asked Everhart to tell Keywell about Quitman.

On March 4, 1998, Keywell called Bruce, stating that Everhart had told him to call. Keywell invited Bruce to come visit Brandon's distribution center in Chicago to talk about doing business together. Bruce then made arrangements for him and Larry Snyder, a Quitman sales representative, to go visit Brandon in Chicago.

On March 13, 1998, Bruce and Snyder visited Brandon in Chicago. Bruce, Snyder, Keywell, and Eric Lefkofsky, who is Brandon's Chief Executive Officer, were present for the meeting, during which the parties discussed Brandon's needs for production and how Quitman could meet those needs. The parties also discussed Quitman's quest to form an alliance with another company in the sports apparel business. The meeting ended with parties agreeing that Brandon would supply Quitman with information about Brandon's needs for the Fall of 1998 so that Quitman could prepare a price quote and that discussions would continue about how the two companies could form an alliance of some sort. After the meeting, Bruce and Snyder toured Brandon's facility.

After the March 13th meeting and before April 13, 1998 (the date on which Quitman representatives would visit Brandon in Chicago again), the parties sent a number of communications to one another. This included Brandon faxing Bruce the information about Brandon's production needs for the Fall of 1998 and Bruce faxing Brandon a list of the orders that Brandon had given Quitman, which listed the quantities ordered and agreed upon ship dates.

On April 14, 1998, Bruce and Snyder returned to Chicago, along with Phillip Feinberg, who is the Secretary/Treasurer of Quitman, to visit Brandon. The parties toured Brandon's facilities and discussed various ways of integrating their organizations.

During April of 1998 through June of 1998, Brandon faxed Quitman many purchase orders for the purchase and manufacture of thousands of garments. The purchase orders identified the garments being purchased by Brandon from Quitman, the garments being manufactured by Quitman for Brandon, and the amount of money to be paid by Brandon to Quitman. The purchase orders were prepared and completed in Chicago and were faxed to Quitman's offices in New York. As part of the agreement, Brandon agreed to, and did, supply Quitman with materials and supplies for the manufacture of garments, which ended up being over $100,000 worth of materials.

After the April 14th meeting and before the end of June 1998 (the time at which Quitman representatives would visit Brandon for a third and final time), the parties communicated back and forth with one another by phone, fax, and letter with respect to matters concerning the purchase orders. These communications included letters and faxes sent by Quitman to Brandon in Chicago and telephone calls between Bruce and Keywell or Lefkofsky in Chicago.

Pursuant to the purchase orders, Quitman made many shipments of goods to Brandon. The first shipment was shipped overnight via United Parcel Service. Quitman claims that besides the first shipment, all product was picked up by Brandon in

Georgia rather than Quitman shipping the product to Illinois. According to Carolyn Brooker (the Brandon employee who handled Brandon's relationship with Quitman on a day-to-day basis), there were shipments that were F.O.B. Georgia; however, there were also shipments where Quitman sent the product to Illinois. In support of Brooker's statement, Brandon submitted a copy of a Bill of Lading which shows that Quitman shipped product to Illinois.

Meanwhile, discussions about the possibility of a merger between the two companies continued. In June of 1998, Quitman representatives visited Brandon in Chicago to conduct a due diligence investigation, during which Quitman representatives discovered what they believed to be problems with Brandon's accounting records. After the due diligence investigation, Quitman representatives made no further trips to Illinois on behalf of Brandon and all merger negotiations ceased. After that occurred, all discussions between Brandon and Quitman were via telephone and fax and consisted of discussions about shipping and payment. During the months from June through mid-October of 1998, over 200 calls were placed from Quitman to Brandon in Chicago, with at least 38 of those calls lasting longer than two minutes.

According to Brandon, during the months from May through October of 1998, Bruce and Phillip made representations to Lefkofsky and Keywell that Quitman would supply Brandon with quality goods in a timely fashion and would use only the materials supplied by Brandon to Quitman for use in garments that Quitman was making pursuant to a Brandon purchase order. At the time that these representations were made, Lefkofsky and Keywell were in Lefkofsky's office in Chicago. Brandon alleges that despite these representations, Quitman failed to deliver the garments ordered by Brandon in an acceptable condition and at the dates and times agreed to by the parties. Brandon further alleges that Quitman refused to use the materials and supplies provided by Brandon to manufacture the garments ordered by Brandon and refuses to return the materials and supplies to Brandon.

Based on the above, Brandon filed a complaint against Quitman in this court, which was amended on November 16, 1998. The first amended complaint contains claims for breach of contract, fraud and misrepresentation, and unjust enrichment. This court has subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1332 as there exists complete diversity between the parties and the amount in controversy exceeds $75,000. In response to Brandon's complaint, Quitman filed a motion to dismiss for lack of personal jurisdiction, to dismiss for improper venue, or, alternatively, to transfer the case to the United States District Court for the Middle District of Georgia pursuant to 28 U.S.C. § 1404(a).

## II. DISCUSSION

### A. Quitman's motion to dismiss for lack of personal jurisdiction

Quitman has moved to dismiss for lack of personal jurisdiction, arguing that Quitman's "contacts with Illinois do not meet the requirements of due process under either the Illinois or United States Constitutions." (Def.'s Mot. at 6.) Brandon opposes the motion, arguing that this court's assertion of jurisdiction would not violate due process.

The standard for deciding a motion to dismiss for lack of personal jurisdiction is straightforward. The plaintiff bears the burden of proving that personal jurisdiction exists. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997); *McIlwee v. ADM Indus., Inc.*, 17 F.3d 222, 223 (7th Cir.1994). In deciding a motion to dismiss for lack of personal jurisdiction, the court may receive and consider affidavits from the parties. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir.1987). The court resolves factual disputes in the pleadings and affidavits in favor of the plaintiff but takes as true those facts contained in the defendant's affidavits that

remain unrefuted by the plaintiff. *RAR,* 107 F.3d at 1275; *Boese v. Paramount Pictures Corp.,* No. 93 C 5976, 1994 WL 484622, at \*2 (N.D.Ill. Sept.2, 1994) (citing *Nelson v. Park Indus., Inc.,* 717 F.2d 1120, 1123 (7th Cir.1983)). The court must also accept as true those allegations in the complaint which are uncontroverted by the defendant's affidavits. *Turnock,* 816 F.2d at 333.

In a case based on diversity of citizenship, a federal district court sitting in Illinois has personal jurisdiction over a nonresident defendant only if an Illinois court would have jurisdiction. *RAR,* 107 F.3d at 1275. For an Illinois court to have personal jurisdiction over a nonresident defendant, personal jurisdiction must be permitted by (1) Illinois statutory law; (2) the Illinois Constitution; and (3) the Constitution of the United States. *Id.* at 1276. With respect to Illinois statutory law, the Illinois long-arm statute extends personal jurisdiction to the limit allowed under the due process clauses of the Constitution of the United States and Illinois Constitution. 735 ILL.COMP.STAT. § 5/209(c); *RAR,* 107 F.3d at 1276; *Dehmlow v. Austin Fireworks,* 963 F.2d 941, 945 (7th Cir.1992). Thus, in Illinois, the court need only inquire whether personal jurisdiction is permitted by (1) the Illinois Constitution and (2) the Constitution of the United States. *RAR,* 107 F.3d at 1276; *Banwell v. Illinois College of Optometry,* 981 F.Supp. 1137, 1139 (N.D.Ill.1997). If jurisdiction is improper under either the United States or Illinois Constitution, the court cannot exercise jurisdiction over the defendant. *Glass v. Kemper Corp.,* 930 F.Supp. 332, 337 (N.D.Ill.1996).

### 1. Whether the Illinois Constitution permits personal jurisdiction

The Illinois Constitution contains a guarantee of due process which is separate and independent from the federal due process clause. *Rollins v. Ellwood,* 141 Ill.2d 244, 152 Ill.Dec. 384, 565 N.E.2d 1302, 1316 (1990). "[T]he doctrine of constitutional avoidance counsels that 'federal courts should avoid addressing federal constitutional issues when it is possible to dispose of a case on state grounds.'" *RAR,* 107 F.3d at 1276 (quoting *Triple G Landfills, Inc. v. Board of Comm'rs of Fountain County, Ind.,* 977 F.2d 287, 291 (7th Cir.1992)). Accordingly, the court must first attempt to address whether the Illinois Constitution permits personal jurisdiction in this case.

There are two problems with the court's attempting to address this issue first. The first problem is that although "[t]he Illinois Supreme Court has made it clear that the Illinois due process guarantee is not necessarily co-extensive with the federal due process protections, ... the Illinois courts have given little guidance as to how state due process protection differs from federal protection in the context of personal jurisdiction." *RAR,* 107 F.3d at 1276. The Illinois Supreme Court has only explained that " '[j]urisdiction is to be asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois.'" *Id.* However, other than this general statement, there is a paucity of case law on the issue.

The second problem with attempting to address the state constitutional issue first is that the parties have failed to address this issue in their briefs. Although Quitman argues that personal jurisdiction is not permitted by the Illinois Constitution, Quitman offers not even a scintilla of analysis on this issue. Quitman only analyzes the federal constitutional issue.

Because there is no guidance on the difference between Illinois and federal due process protections and because the parties have not addressed this issue in their briefs, the court's analysis will focus on the federal constitutional issue. *See infra* Part II.A.2. After addressing the federal constitutional issue, the court will then revisit the state constitutional issue. *See infra* Part II.A.3; *see also Michael J. Neuman & Assocs. v. Florabelle Flowers,*

*Inc.*, 15 F.3d 721, 725 (7th Cir.1994) ("While a court must conduct an independent analysis of due process under Illinois law, it may look to federal due process for guidance.").

### 2. Whether the Constitution of the United States permits personal jurisdiction

 The Due Process Clause of the Fourteenth Amendment limits when a state court may assert personal jurisdiction over a nonresident defendant. *RAR,* 107 F.3d at 1277. Federal due process requires that the defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). Courts have typically considered the due process analysis as a two-part inquiry: (1) the court must determine whether minimum contacts exist and, if so, (2) the court must determine whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. *Tingstol Co. v. Rainbow Sales, Inc.,* 8 F.Supp.2d 1113, 1115 (N.D.Ill.1998).

 In deciding whether the federal Constitution permits the exercise of personal jurisdiction, the court is under no obligation to defer to Illinois state courts' interpretation of federal law. *RAR,* 107 F.3d at 1276. State-court precedent is binding upon a federal court sitting in diversity with respect to state-law issues; however, state-court precedent is only persuasive authority with respect to issues of federal law. *Id.* Thus, although the parties have relied on cases from the Illinois state courts with respect to this issue, the court will look to the body of federal case law to resolve the issue of whether the federal constitution permits the exercise of personal jurisdiction in this case.

### a. Whether Quitman has minimum contacts with Illinois

 Minimum contacts are those acts by which the defendant has "purposefully avail[ed] [himself] of the privilege of conducting activities within the forum," *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), such that he should "reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). If a defendant has purposefully availed himself of the privilege of conducting business within the state, he has enjoyed the benefits and protections of that state's laws such that jurisdiction over him satisfies due process. *Hanson,* 357 U.S. at 253, 78 S.Ct. 1228; *Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co.,* 18 F.3d 389, 394 (7th Cir.1994).

 Subject to the limits of due process, a court may exercise two types of personal jurisdiction over a nonresident defendant: general and specific. *Glass v. Kemper Corp.,* 930 F.Supp. 332, 338 (N.D.Ill.1996). General jurisdiction exists in cases where a defendant has "continuous and systematic general business contacts" with a state which allows the defendant to be sued in that state regardless of the subject matter of the suit. *Logan Productions, Inc. v. Optibase, Inc.,* 103 F.3d 49, 52 (7th Cir.1996) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Specific jurisdiction exists in a case where the defendant has a lesser degree of contact with the state, but the litigation arises out of or is related to those contacts. *Id.*

 In this case, Brandon argues that Quitman has sufficient minimum contacts for this court to exercise both specific and general jurisdiction over Quitman. The court first addresses whether it has specific jurisdiction over Quitman.

 In a specific jurisdiction case, the court must determine "whether a defen-

dant 'has purposefully established minimum contacts with the forum State'" such that it should "reasonably anticipate being haled into court [in the forum State]" because it has "'purposefully availed itself of the privilege of conducting activities' there." *RAR,* 107 F.3d at 1277. To determine whether specific jurisdiction exists, the court must assess the relationship among the defendant, the forum, and the litigation. *NUCOR v. Aceros Y Maquilas de Occidente, S.A. de C.V.,* 28 F.3d 572, 580 (7th Cir.1994).

Specific jurisdiction requires that the suit "arise out of" or "be related to" the nonresident defendant's contacts with the forum state. *Helicopteros,* 466 U.S. at 414 n. 8, 104 S.Ct. 1868; *Wilson v. Humphreys (Cayman) Ltd.,* 916 F.2d 1239, 1244 (7th Cir.1990). The court "cannot simply aggregate all of a defendant's contacts with a state-no matter how dissimilar in terms of geography, time or substance-as evidence of the constitutionally required minimum contacts." *RAR,* 107 F.3d at 1277. "[I]n a breach of contract case, it is the 'dealings *between the parties in regard to the disputed contract*' that are relevant to minimum contacts analysis." *Id.* at 1278 (emphasis in original). In a case where the parties have engaged in an ongoing commercial relationship involving repeated transactions over time, the only past contacts which are relevant to personal jurisdiction are those "past contacts involving the forum state [that] either bear on the substantive legal dispute between the parties or inform the court regarding the economic substance of the contract." *Id.*[1]

Applying the above principles, the court finds that Quitman has purposefully established minimum contacts with Illinois sufficient to justify exercising specific jurisdiction over Quitman. First, it is undisputed that Quitman regularly contacted Brandon in Illinois via telephone, fax, and letter

regarding the disputed contracts. *See Heritage House Restaurants v. Continental Funding,* 906 F.2d 276, 283 (7th Cir. 1990) (finding jurisdiction where the defendant created a relationship which was naturally based on telephone and mail contacts rather than physical presence). For example, during the months from June through mid-October of 1998, Quitman placed over 200 telephone calls to Brandon in Chicago, with at least 38 of those calls lasting longer than two minutes. These communications concerned price quotes, shipping information, production issues, payment issues, and other issues regarding the contracts in dispute. It makes no difference that the vast majority of contact between the parties occurred via telephone, fax, and letter. As the Supreme Court has stated:

> [I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *see also Mid–America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1361 (7th Cir.1996).

In addition, Quitman representatives physically came into Illinois and visited Brandon as part of the negotiations over the contracts at issue in this case. As the Seventh Circuit has repeatedly recognized, "'a defendant's participation in substantial negotiations conducted in the forum state leading to the contract at issue

---

1. The court must emphasize that this is the standard to be applied in evaluating what contacts are relevant to the court's determination of whether the defendant has minimum contacts with the forum state sufficient to justify the exercise of specific, not general, jurisdiction.

is a significant basis for personal jurisdiction.'" *Mid–America Tablewares,* 100 F.3d at 1361; *see also NUCOR,* 28 F.3d at 581 (finding jurisdiction constitutional because defendant attended one meeting in the forum state out of which the parties' relationship was formed); *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.,* 726 F.2d 1209, 1215–16 (7th Cir.1984) (holding that discussions in Illinois leading to contract created jurisdiction); *Neiman v. Rudolf Wolff & Co.,* 619 F.2d 1189, 1193 (7th Cir.1980) (holding that defendant's attendance at lunch meeting in Illinois on terms of contract was sufficient to justify jurisdiction). Moreover, by coming to Chicago and engaging in preliminary discussions, Quitman invoked the benefits and protections of Illinois law. *See Mid–America Tablewares,* 100 F.3d at 1361 (finding defendant invoked the benefits and protections of forum state when defendant's agent visited forum state for a three-day period to conduct preliminary discussions because, at a minimum, the forum state provided police and fire protection for defendant's agent). Quitman downplays the significance of the visit by arguing that Brandon invited Quitman to visit Illinois. However, it is clear from the record that Quitman was not forced to visit Illinois; rather, Quitman willingly visited Brandon in Illinois to discuss the possibility of Quitman producing garments for Brandon.

Finally, it is undisputed that Quitman shipped goods directly into Illinois on at least two occasions. The first shipment was shipped directly into Illinois via UPS. In addition, Brandon has submitted a Bill of Lading which shows that Quitman shipped goods into Illinois via Ltd. Traffic Department. Further, it is undisputed that Quitman knew that all of the goods that it was shipping to Brandon were bound for Illinois. *See Mid–America Tablewares,* 100 F.3d at 1360.

Both parties spend much time arguing about which company initiated the transactions in question, with Quitman arguing that the court does not have personal jurisdiction over it, in part, because Brandon initiated the transactions. The constitutionality of jurisdiction, however, does not depend only on which party initiated the transactions in question. *Logan Prods., Inc.,* 103 F.3d at 53. Rather, determining which party initiated the transaction is merely one factor which might be helpful in determining whether personal jurisdiction exists. *Id.* Assuming *arguendo* that Brandon initiated the transaction, personal jurisdiction nonetheless comports with due process in this case.

In sum, considering the totality of the circumstances, the court finds that Quitman knowingly reached out and created a continuing relationship with an Illinois corporation. Quitman's contacts with Illinois were not "random," "fortuitous," or "attenuated." Rather, by its affirmative acts of visiting Illinois, regularly contacting Brandon in Illinois via phone, fax, and letter, and shipping goods into Illinois, Quitman purposefully established minimum contacts with Illinois such that it should reasonably anticipate being haled into an Illinois court.[2]

### b. Whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice

Having determined that Quitman has minimum contacts with Illinois, the court must now determine whether exercising personal jurisdiction over Quitman in this case is reasonable, i.e., comports with traditional notions of fair play and substantial justice. Factors that the court should consider in this inquiry include: (1) the burden on the defendant of litigating in the forum state; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the inter-

---

**2.** Because the court finds that Quitman has sufficient minimum contacts to justify the court's assertion of specific jurisdiction over Quitman, the court need not address Brandon's argument that this court may also assert general jurisdiction over Quitman.

state judicial system's interest in resolving the dispute in the most efficient manner; and (5) the shared interest of the several states in furthering fundamental social policy. *Logan Prods., Inc.*, 103 F.3d at 53. Once minimum contacts have been established, (1) the defendant can only escape jurisdiction by making a "compelling case" that forcing it to litigate in the forum state would be unreasonable, *id.*, and (2) the interests of the plaintiff and the forum in exercise of jurisdiction will often justify even a serious burden on the nonresident defendant, *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 109, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

In this case, Quitman's minimum contacts with the State of Illinois make personal jurisdiction fair and reasonable. Contrary to Quitman's unfounded assertion, Illinois has a significant interest in this case given that Brandon is a citizen of, and is doing business in, Illinois. *Mid-America Tablewares*, 100 F.3d at 1362; *Heritage House Restaurants, Inc.*, 906 F.2d at 284. Further, Brandon's interest in obtaining convenient and effective relief will be served best by litigation in Illinois.

In contrast, Quitman has failed to point to facts which make out a "compelling case" of why jurisdiction is unreasonable. Quitman argues that it will be burdened by litigation in Illinois. While there may be a case in which the inconvenience to the defendant is "so substantial as to achieve constitutional magnitude," *Burger King*, 471 U.S. at 484, 105 S.Ct. 2174, Quitman has failed to show that this is such a case. Quitman has also failed to show that its claimed burden outweighs Brandon's interest in obtaining convenient and effective relief. Finally, while Quitman argues that "[t]rial in Georgia will be more efficient," Quitman has failed to present a convincing argument that this is true.

In sum, the court finds that the Due Process Clause of the Fourteenth Amendment does not preclude Illinois from exercising personal jurisdiction over Quitman. Quitman has purposefully established minimum contacts with Illinois such that it

should have reasonably anticipated being haled into an Illinois court to defend itself. Further, Quitman has failed to make a compelling case that forcing it to litigate in Illinois would be unreasonable. Accordingly, the court finds that personal jurisdiction over Quitman is permitted by the federal constitution.

### 3. Illinois due process revisited

■ Having determined that jurisdiction over Quitman is permitted by the federal constitution, the court must now determine whether such jurisdiction is permitted by the Illinois Constitution. As previously stated, under the Illinois Constitution's guarantee of due process, "[j]urisdiction is to be asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins*, 152 Ill.Dec. 384, 565 N.E.2d at 1316.

■ In this case, the court finds that assertion of personal jurisdiction over Quitman would not violate Illinois due process. In this case, Quitman knowingly conducted and sought to benefit from an ongoing commercial relationship with an Illinois corporation. *See Autotech Controls Corp. v. K.J. Elec. Corp.*, 256 Ill. App.3d 721, 195 Ill.Dec. 526, 628 N.E.2d 990, 995–96 (1993); *Allerion, Inc. v. Nueva Icacos, S.A. de C.V.*, 283 Ill.App.3d 40, 218 Ill.Dec. 632, 669 N.E.2d 1158, 1166 (1996). Quitman not only visited Illinois related to this relationship, but Quitman also regularly contacted the Illinois corporation via telephone, fax and letter and shipped goods into Illinois. Finally, the fact that the federal due process permits jurisdiction in this case is supportive of the finding that the Illinois Constitution also permits such jurisdiction. *Michael J. Neuman & Assocs.*, 15 F.3d at 725 ("While a court must conduct an independent analysis of due process under Illinois law, it may look to federal due process for guidance.").

In sum, the court finds that personal jurisdiction is permitted by both the Constitution of the United States and the Illinois Constitution. Accordingly, the court denies Quitman's motion to dismiss this case for lack of personal jurisdiction. Further, the court denies Quitman's motion to dismiss for improper venue because, as Quitman conceded, if this court can exercise personal jurisdiction over Quitman, venue is proper in this district. 28 U.S.C. § 1391; Def.'s Memo. at 8. Accordingly, the court must now address Quitman's motion to transfer this case pursuant to 28 U.S.C. § 1404(a).

### B. *Quitman's motion to transfer venue pursuant to 28 U.S.C. § 1404(a)*

Section § 1404(a), which governs the transfer of an action from one federal district court to another, provides: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). A transfer under § 1404(a) is appropriate if: (1) venue is proper in both the transferor and transferee court; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interest of justice. *Vandeveld v. Christoph,* 877 F.Supp. 1160, 1167 (N.D.Ill. 1995).

In determining whether a motion under § 1404(a) should be granted, the court must seek to promote the efficient administration of justice and not merely the private interests of the parties. *North Shore Gas Co. v. Salomon, Inc.,* 896 F.Supp. 786, 791 (N.D.Ill.1995). The determination of whether a case should be transferred pursuant to § 1404(a) is committed to the sound discretion of the trial court. *Heller Fin., Inc. v. Midwhey Powder Co.,* 883 F.2d 1286, 1293 (7th Cir.1989); *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 219 (7th Cir.1986). The party seeking a transfer under § 1404(a) bears the burden of establishing that the transferee court is clearly more convenient. *Coffey,* 796 F.2d at 219–20.

In this case, venue is proper in both the transferee and the transferor court. *See* 28 U.S.C. § 1391. The issue is whether the convenience of the parties and witnesses and the interest of justice factors weigh in favor of transfer. It is those two factors, therefore, that the court addresses.

### 1. The convenience of the parties and witnesses

The court must first consider the convenience of the parties and witnesses. When evaluating the convenience of the parties and witnesses, the court should consider: (1) the plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience to the parties of litigating in the respective forums. *North Shore Gas Co.,* 896 F.Supp. at 791; *College Craft Cos. Ltd. v. Perry,* 889 F.Supp. 1052, 1054 (N.D.Ill.1995).

### a. Plaintiff's choice of forum

A plaintiff's chosen forum is entitled to substantial deference, particularly where the chosen forum is the plaintiff's home forum. *Vandeveld,* 877 F.Supp. at 1167. While a plaintiff's choice of forum is an important consideration in determining whether a motion to transfer should be granted, however, it is not absolute and will not defeat a well-founded motion to transfer. *Applied Web Sys., Inc. v. Catalytic Combustion Corp.,* No. 90 C 4411, 1991 WL 70893, at *3 (N.D.Ill. Apr.29, 1991).

In this case, Illinois is both Brandon's home forum and chosen forum. Further, contrary to Quitman's arguments, Illinois is the situs of some of the material events in this case. Part of the negotiations over the contracts took place in Illinois. The contracts were prepared and completed in Illinois. Pursuant to the contract, Brandon was required to, and did, send materials to Quitman in Georgia. Finally, the alleged misrepresentations were made to

Brandon representatives in Illinois. Accordingly, as Illinois is Brandon's chosen and home forum and is the situs of some of the material events in this case, Brandon's choice of Illinois as the forum is entitled to substantial deference.

### b. The relative ease of access to sources of proof

Quitman's only argument with respect to the ease of access to sources of proof is that the property retained by Quitman, i.e., the materials supplied by Brandon, is located in Georgia. The court is satisfied, however, that Quitman can easily transport that property to Illinois if need be. Therefore, this consideration neither militates for or against transfer.

### c. The convenience of the witnesses

"The convenience of witnesses is often viewed as the most important factor in the transfer balance." *Rose v. Franchetti*, 713 F.Supp. 1203, 1214 (N.D.Ill.1989). The determination of whether a particular venue is more convenient for the witnesses should not turn on which party produces a longer witness list. *Chemical Waste Management, Inc. v. Sims*, 870 F.Supp. 870, 876 (N.D.Ill.1994). Rather, the court must look to the nature and quality of the witnesses' testimony with respect to the issues of the case. *Vandeveld*, 877 F.Supp. at 1168. Further, the court will not consider the convenience of unidentified witnesses. *See id.* Finally, the convenience of employee-witnesses is generally assigned little weight. *Applied Web Sys.*, 1991 WL 70893, at *5.

In this case, Quitman has failed to provide the court with the information necessary to evaluate the nature and quality of the witnesses' testimony. Quitman simply produces a laundry list of potential, not expected, witnesses and, in some instances, generally states to what the witness can testify without specifying why that testimony would be important in this case. The court will not speculate on such matters. It was up to Quitman to provide this information, and Quitman has failed to do so in an adequate and informative matter.

Therefore, the consideration about the convenience of the witnesses weighs neither in favor of nor against transfer.

### d. The convenience of the parties

The next factor that the court should consider is the convenience of the litigants. Specifically, the court should consider their respective residences and their ability to bear the expenses of litigating in a particular forum. *Habitat Wallpaper & Blinds, Inc. v. K.T. Scott Ltd. Partnership*, 807 F.Supp. 470, 474 (N.D.Ill. 1992). Transfer is inappropriate if it "merely transforms an inconvenience for one party into an inconvenience for the other party." *Chemical Waste Management, Inc.*, 870 F.Supp. at 876.

Brandon is a resident of Illinois. Quitman is a resident of Georgia. Litigating outside of one's home forum is always more burdensome than litigating at home. However, Quitman has made no showing that transfer would do more than "merely transform[ ] an inconvenience for one party into an inconvenience for the other party." Therefore, as far as the residences of the parties are concerned, any consideration of the convenience of the parties is a wash. Further, neither party has shown that one of these corporations is in a better position to bear the expense of litigating in a foreign forum. Accordingly, this factor weighs neither for nor against transfer.

### 2. Interests of justice

The final factor to be considered is whether transfer will serve the interest of justice. The "interest of justice" component "embraces traditional notions of judicial economy, rather than the private interests of the litigants and their witnesses." *TIG Ins. Co. v. Brightly Galvanized Prods., Inc.*, 911 F.Supp. 344, 346 (N.D.Ill.1996). It includes such considerations as the speed at which the case will proceed to trial, the court's familiarity with the applicable law, the relation of the community to the occurrence at issue, and the

desirability of resolving controversies in their locale. *H&V Silver Mine, Inc. v. Cohen*, No. 96 C 3550, 1997 WL 639229, at *5 (N.D.Ill. Oct.6, 1997).

### a. The speed at which the case will proceed to trial

For the purposes of evaluating this factor, the court used the reports from the *Federal Court Management Statistics* for the period ending September 30, 1997, which are the latest statistics available at this time. ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS, 1997 FEDERAL COURT MANAGEMENT STATISTICS. Of the numerous court management statistics, the two most relevant statistics to the court's current analysis are (1) the median months from filing to disposition and (2) the median months from filing to trial. *Vandeveld*, 877 F.Supp. at 1169; *Applied Web Sys., Inc.*, 1991 WL 70893, at *8.

The median months from filing to disposition was 5 months in the Northern District of Illinois compared to 13 months in the Middle District of Georgia. The median months from filing to trial was 24 months in the Northern District of Illinois compared to 23 months in the Middle District of Georgia. Thus, while this case is likely to go to trial 1 month earlier in the Middle District of Georgia, this case is likely to be disposed of 8 months earlier in the Northern District of Illinois. Given these specific statistics, the court finds that a comparison of the relevant statistics weighs against transferring the case to the Middle District of Georgia.[3]

### b. The court's familiarity with the applicable law

In this case, there are three claims, all of which will be governed by state law. Quitman provides a cursory analysis of the choice-of-law issue, arguing that Georgia law will govern this case. Brandon does not analyze the issue at all.

Without a meaningful analysis of the choice-of-law issue, the court cannot determine which state's law would apply. *See Vandeveld*, 877 F.Supp. at 1169. However, the court need not resolve this issue. While it is highly likely that a court in the Middle District of Georgia is more familiar with Georgia law than this court is, federal courts are often called upon to decide substantive legal questions based on the laws of various states. Certainly Quitman cannot contend that either Georgia contract law or tort law is so unique as to be beyond the bounds of this court's abilities. If Georgia law were to govern, this court would be quite able to apply that law to this case. Accordingly, a consideration of the applicable law weighs neither in favor of nor against transfer.

### c. The relation of the community and the desirability of resolving controversies in their locale

In this case, Illinois has a strong tie to the litigation. First, Illinois courts have a strong interest in hearing breach-of-contract cases involving Illinois residents. *Vandeveld,* 877 F.Supp. at 1165. Second, as previously explained, Illinois is the situs of many material events in this case.

Quitman argues that this factor weighs in favor of transfer because "the Middle District of Georgia is the locale for both QMC's principal place of business and is close to Brandon's Sylvania facility" while "the Northern District of Illinois is the locale for Brandon only." (Def.'s Reply at 14.) The court rejects Quitman's argument. First, Brandon no longer has a facility in Georgia. Second, the fact that Georgia might have an interest in this case does not vitiate Illinois' interest. Thus, this factor does not weigh in favor of transfer.

### 3. Resolution

Based on the above considerations, the court finds that Quitman has failed to show

---

**3.** The court rejects Quitman's argument that the court was faced·with *similar* statistics in *Tingstol.* The *Tingstol* were different.

that the Middle District of Georgia is clearly the more convenient forum. First, Illinois is Brandon's home forum, its chosen forum, and the situs of some material events in this case. Second, Quitman has failed to show that transfer would best serve the convenience of the parties and witnesses. Third, statistics suggest that the case might be resolved more quickly in the Northern District of Illinois than in the Middle District of Georgia. Fourth and finally, Illinois has a strong interest in hearing this case.

### C. *Phillip Feinberg's affidavits*

There is one final, troubling matter that this court must address. In support of its motion, Quitman submitted with its opening brief an affidavit from Phillip Feinberg. In this affidavit, Phillip stated that he had "personal knowledge of all actions of QMC and of the facts stated herein." (Phillip Feinberg Aff. ¶ 2.) In opposition to Quitman's motion, Brandon submitted the affidavits of Eric Lefkofsky and Carolyn Brooker, in which those affiants state that many of the facts contained in Phillip's affidavit are "incorrect and misleading." (Lefkofsky Aff. ¶ 3; Brooker Aff. ¶¶ 5–9.)

Quitman then filed its reply brief. In its reply brief, Quitman acknowledged that Phillip's original affidavit contained "inaccuracies." Quitman attributed these "inaccuracies" to the fact that Phillip "misunderstood the details of several events at which he was not present." (Def.'s Reply at 1.) Quitman also submitted a new affidavit from Phillip with its reply brief. (Def.'s Reply Ex. C.) In the affidavit, Phillip admits that there were "a few facts" in the original affidavit that were "misleading." Phillip states, however, that he "never intended them to be misleading." (*Id.* ¶ 8.) Phillip attributes his mistakes to the fact that he "did not have time to send the Affidavit to Bruce [Feinberg] and Larry [Snyder] for final review and edit." (*Id.* ¶ 7.)

The court is seriously troubled by Phillip's misconduct.[4] Phillip submitted a sworn statement to a federal court that stated that he had "personal knowledge" of the facts stated therein. As is obvious from Quitman's reply brief and Phillip's new affidavit, Phillip did not have personal knowledge about many of the facts to which he testified. This type of misconduct is an example of the ethical lapses that leads the public to become cynical of the American legal system and, indeed, the legal profession in whole. *See International Gateway Communications, Inc. v. Communication Telesystems Int'l, Inc.,* 922 F.Supp. 122, 126 (N.D.Ill.1996).

Phillip's only saving grace is that he and Quitman's attorney admitted the false statements in a timely manner. By doing so, Quitman was able to remedy the fraud perpetrated upon this court. Further, the court will accept Phillip at his word that he did not intend for the affidavit to be "misleading." Therefore, the court will not sanction Quitman for Phillip's misconduct. However, no further misconduct in this case will be tolerated. Sanctions will be imposed the next time that either of the parties engages in serious misconduct before this court, regardless of any later *mea culpa.*

### III. *CONCLUSION*

For the foregoing reasons, the court denies defendant's motion to dismiss for lack of personal jurisdiction and for improper venue and motion to transfer venue. Defendant is ordered to file an answer plaintiff's to complaint no later than April 9, 1999.

---

**4.** The court will not attribute Phillip's misconduct to Quitman's attorneys because there is no evidence that the attorneys knew that Phillip was lying about the scope of his personal knowledge of the facts in this case at the time that Phillip's original affidavit was submitted.