In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2638

CITADEL GROUP LIMITED, A DELAWARE CORPORATION,

*Plaintiff-Appellant*,

v.

WASHINGTON REGIONAL MEDICAL CENTER,
AN ARKANSAS NON-PROFIT CORPORATION,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 1394—**Marvin E. Aspen**, *Judge.*

———————

ARGUED FEBRUARY 26, 2008—DECIDED AUGUST 5, 2008

———————

Before KANNE, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* This case resulted from the planned construction of a medical office building in Arkansas. Washington Regional Medical Center ("WRMC") hired Citadel Group to develop the project, but the project closing never occurred due to WRMC's concern over mounting costs. Citadel filed suit to recover its development costs against WRMC in the Circuit Court of Cook County, Illinois. WRMC removed the case to the

Northern District of Illinois based on diversity jurisdiction and filed a motion to dismiss for lack of personal jurisdiction, or in the alternative, for a change of venue to the Western District of Arkansas. The district court dismissed the case for lack of personal jurisdiction. We reverse.

## I. Background

WRMC, an Arkansas non-profit corporation with its principal place of business in Arkansas, sent a "Request for Proposal" to several developers in various states in May 2005. WRMC's request outlined a plan in which Washington Regional Medical Foundation, an affiliated non-profit corporation, would execute a ground lease for unimproved land to a developer. The developer would construct a medical office building on the land and, once the construction was complete, would lease part of the space back to WRMC. Citadel, a Delaware corporation with its principal place of business in Illinois, received WRMC's request and responded with a proposal on May 13, 2005. WRMC asked Citadel for additional information on a few occasions during the following months. In June, WRMC sent Citadel an email requesting that it fill out two forms to provide additional details on the project cost breakdown and a lease and operating rate summary. In July, WRMC sent Citadel an email requesting some documentation for WRMC's auditors. In August, WRMC provided Citadel with information on the potential of a shared parking arrangement between the medical office building site and a neighboring site. In September, WRMC sent Citadel an email asking for clarification on the invoicing process that would be used by Citadel and the entities it hired and the costs encom-

passed by the authorization to proceed that Citadel had asked WRMC to sign. Citadel responded to the June and July requests; the record does not reflect what response, if any, Citadel gave to WRMC in September. WRMC signed the authorization to proceed on September 15, 2005, and sent a deposit to Citadel.[1] During the negotiations, representatives of WRMC never traveled to Illinois, but representatives of Citadel traveled to Arkansas once.

The authorization to proceed encompassed "project development," but the long-term relationship envisioned by WRMC in the request for proposal was still in the theoretical stage; the ground lease had not been executed, which necessarily precluded actual construction. The authorization was attached to Citadel's proposal, which touted its expertise in reducing costs through special financing rather than just through "value engineering,"

---

[1] The authorization to proceed simply stated:

> Washington Regional Medical Center authorizes Citadel Group Limited to proceed with Project development at a fee of four percent (4%) of project costs according to the following schedule: (i) a 1% good faith deposit upon execution of this proposal, and (ii) the balance from Project funding. Washington Regional Medical Center is responsible for all legal expenses and other costs associated with Project development, except architectural and engineering fees, whether or not the Project is ultimately developed. Project costs and expenses may be included in the Project's budget and hence, refunded to Washington Regional Medical Center at Project funding. Washington Regional Medical Center will only be responsible for architectural and engineering fees in the event Washington Regional Medical Center does not execute its space leases and ground lease.

which Citadel warned could "result in compromising project quality." Citadel explained in its affidavit filed in response to WRMC's motion to dismiss that the special financing involved a public offering of commercial paper notes which would reduce finance costs as compared to a traditional mortgage. The goal of the financing was to provide WRMC with the opportunity to lease the finished space at attractive lease rates because the cost of capital for construction was lower.

After WRMC executed the authorization, it requested by email that Citadel provide it with a development calendar. Citadel responded with a calendar that spanned from October 2005 to May 2006 and encompassed activities such as the selection of an architect and general contractor, zoning review, design development, credit enhancement, appraisals, title commitment, legal drafting, and many scheduled conference calls. Citadel began to engage other entities to accomplish the activities set forth in the development calendar. Citadel, WRMC, and the other entities participated in conference calls to discuss the status of the project development in November 2005 and January, February, March, April, and May 2006.[2] WRMC sent Citadel questions by email on several occasions in the intervening months. WRMC also provided Citadel with information such as its past financial statements, a proposed ground lease, and a request that three Arkansas banks be permitted to participate in the financing. In March 2006, WRMC sent Citadel an email inquiring about financing costs, which "seem[ed]

---

[2] The record is unclear as to the number of telephone conferences in which WRMC participated, but WRMC does not deny that it participated in some of them.

very high." On May 5, 2006, WRMC informed Citadel by fax that it was concerned about financing costs and directed Citadel not to incur further costs until WRMC's Board of Directors voted on whether to proceed with the project. At some point after May 15, 2006, WRMC informed Citadel that it would not be closing or proceeding with the project. Citadel filed suit to recover more than $500,000 in costs incurred in the development of the project.

## II. Personal Jurisdiction

We review a district court's decision to dismiss a case for lack of personal jurisdiction de novo. *TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 589 (7th Cir. 2005). As the plaintiff, Citadel bears the burden of making a prima facie showing of the existence of personal jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). A federal court sitting in diversity has personal jurisdiction only where a court of the state in which it sits would have such jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997). Citadel suggests that WRMC is subject to personal jurisdiction in Illinois because the activities WRMC engaged in during the development process were sufficient to confer specific jurisdiction.[3]

---

[3] "When a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum, the State has been said to be exercising 'general jurisdiction' over the defendant." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 & n.9. General jurisdic-

(continued...)

To determine whether personal jurisdiction exists over WRMC in Illinois, we consider the Illinois long-arm statute, the Illinois constitution, and the federal constitution. *See id.* at 1276. The Illinois long-arm statute grants specific jurisdiction in several enumerated instances. *See, e.g.*, 735 Ill. Comp. Stat. 5/2-209(a)(1), (7) (including the "transaction of any business" within the state or the "making or performance of any contract or promise substantially connected" with the state). It also contains a "catch-all" provision which permits a court to "exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." *Id.* § 2-209(c). Thus, the "catch-all" requirements are co-extensive with the state and federal constitutional requirements. *RAR*, 107 F.3d at 1276.

The Illinois constitution requires that jurisdiction be asserted only where "it is fair, just, and reasonable . . . considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Id.* (quoting *Rollins v. Ellwood*, 565 N.E.2d 1302, 1316 (Ill. 1990)). According to the Illinois Supreme Court, the Illinois and federal due process requirements "hypothetically might diverge in some cases." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002) (discussing *Rollins*, 565 N.E.2d at 1316). We have previously noted,

---

[3] (...continued)
tion is appropriate where the defendant's contacts with the forum state are "continuous and systematic." *Id.* at 416. Citadel does not claim that general jurisdiction is applicable here. An analysis of "specific jurisdiction" is appropriate where a suit arises out of or is related to the defendant's contacts with the forum. *Id.* at 414 & n.8.

however, that no case has yet emerged where due process was satisfied under the federal constitution but not under the Illinois constitution. *Id.*; *RAR*, 107 F.3d at 1276. See *Sabados v. Planned Parenthood of Greater Indiana*, 882 N.E.2d 121, 125 & n.2 (Ill. App. Ct. 2007), appeal denied, 888 N.E.2d 1189 (Ill. 2008), for a federal due process analysis by the Illinois Court of Appeals, who noted that no case had yet found jurisdiction under the federal constitution where the Illinois constitution had not also been satisfied. We have no reason to believe, and neither party has advocated, that the types of contacts at issue in this case would not lead to the same result under both constitutional analyses; thus, we will proceed with the federal analysis.

The Due Process Clause of the Fourteenth Amendment prevents a state from exercising specific jurisdiction over a defendant, unless the defendant had "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). A state has an interest in providing its residents with a forum for redressing harms caused by an out-of-state actor, particularly where the out-of-state actor has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 475 (1985) (quoting *Hansen v. Denckla*, 357 U.S. 235, 253 (1958)). The defendant's contacts must not be merely random, fortuitous, or attenuated; rather, the "defendant's conduct and connection with the forum State" must be such that it should "reasonably anticipate being haled into court

there." *Id.* at 474-75 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

In analyzing whether the defendant's contacts are sufficient to establish specific jurisdiction, we do not employ a "mechanical or quantitative" test. *Int'l Shoe*, 326 U.S. at 319. Therefore, a contract between a state resident and an out-of-state defendant alone does not automatically establish sufficient minimum contacts. *Burger King*, 471 U.S. at 478. Instead, we consider the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" in determining whether there were sufficient minimum contacts. *Id.* at 479. We do not count, however, the "unilateral activity" of parties who have some relationship with an out-of-state defendant. *Id.* at 474 (citing *Hansen,* 357 U.S. at 253).

In determining the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing," *id.* at 479, the district court considered several factors, including who initiated the transaction, where the contract was entered into, where the performance of the contract was to take place, and where the contract was negotiated. The district court concluded that, on balance, Citadel did not establish sufficient minimum contacts: "the contract here plainly reflects an explicitly 'preliminary' relationship—between an Arkansas corporation that seriously considered using an Illinois company to administer the construction of a building in Arkansas—that never came to fruition." *Citadel Group Ltd. v. Wash. Reg'l Med. Ctr.*, No. 07 C 1394, 2007 WL 1772262, at *4 (N.D. Ill. June 18, 2007). This is true; the parties' transaction never closed and, therefore, they never executed ground

or space leases and never began construction of the building. In that sense, the parties' relationship was truly preliminary, but, of course, Citadel brings this litigation because it incurred a great deal of expense on behalf of WRMC in preparation for these later anticipated activities.

Citadel claims that WRMC engaged in sufficient minimum contacts and lists twenty-four "contacts"—primarily consisting of correspondence by mail, fax, phone, and email—that should collectively give rise to specific jurisdiction in Illinois. WRMC counters that these contacts are nearly all "unilateral activities" of Citadel or responses to Citadel's requests for information; the remaining contacts are minimal and insufficient to establish jurisdiction.[4]

---

[4] Citadel directs our attention to the case of *Citadel Group Ltd. v. Merle West Medical Center, Inc.*, No. 06-C-6162, 2007 WL 5160444 (N.D. Ill. June 13, 2007), in which Citadel was involved in a similar dispute with a medical center in Oregon. The district court noted the difficulty of determining personal jurisdiction in cases like these: "Merle West argues, correctly, that none of [the factors cited by the parties] alone is necessarily sufficient for the court to exercise personal jurisdiction, while Citadel responds (also correctly) that each is relevant and can support an exercise of jurisdiction in an appropriate case. Not surprisingly . . . both parties were able to cite cases in which courts have found in their favor regarding the sufficiency of these factors in supporting an exercise of jurisdiction." *Id.* at *3. The court ultimately determined, as we have here, that the out-of-state defendant must be subject to personal jurisdiction in Illinois because of the nature of the contract, the types of contacts that occurred during Citadel's performance, and the defendant's knowledge (and authorization) of Citadel's

(continued...)

WRMC relies upon two cases in bolstering its argument that the bulk of the contacts in this case were the unilateral actions of Citadel and are irrelevant for purposes of establishing personal jurisdiction, *Lakeside Bridge & Steel Co. v. Mountain State Construction Co.,* 597 F.2d 596 (7th Cir. 1979) and *Sungard Data Systems, Inc. v. Central Parking Corp.* 214 F. Supp. 2d 879 (N.D. Ill. 2002). In *Lakeside Bridge*, a West Virginia construction company contracted with a Wisconsin corporation to purchase structural assemblies for a dam and reservoir in West Virginia. When the West Virginia company received the assemblies, it claimed they were defective and withheld payment. The Wisconsin corporation filed a lawsuit in Wisconsin, claiming personal jurisdiction was proper because the West Virginia company had knowledge that the manufacture of the goods would take place in Wisconsin, and the parties had contacts by telephone and mail. We found there was no personal jurisdiction over the West Virginia company because the primary contacts with Wisconsin stemmed from the unilateral acts of the Wisconsin corporation: "Although [the West Virginia company] in a sense caused the activity in Wisconsin by placing the order, the contract between the parties left [the Wisconsin corporation] in absolute control over where it would conduct that activity, and it made this decision and conducted the activity unilaterally." *Lakeside Bridge*, 597 F.2d at 603.

In *Sungard*, a Tennessee corporation contracted for business continuity and disaster services to be provided by an Illinois business. The Illinois business filed suit in

---

[4] (...continued)
engagement of the other entities. *Id.* at *5.

Illinois over contract payments that were not received, claiming jurisdiction based on phone calls and payments received, as well as services provided in Illinois such as contract preparation, processing, and billing. The district court noted that "making telephone calls and mailing payments into the forum state are insufficient bases for jurisdiction." *Sungard*, 214 F. Supp. 2d at 881 (quoting *Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co.* 18 F.3d 389, 395 (7th Cir. 1994)). The court concluded that there were not minimum contacts, emphasizing that the contract was not substantially connected to Illinois and noting that it was analogous to an insurance contract centered on a place of business outside of Illinois. *Id.* at 883. It reasoned that the contract was for business continuity services for a business located in Tennessee, and the administrative services provided in Illinois were too insignificant to establish minimum contacts. *Id.*

We first note that *Lakeside Bridge* was decided prior to two key Supreme Court decisions, *Worldwide Volkswagen* and *Burger King*, which provided us with a more robust understanding of personal jurisdiction. Additionally, this court has frequently distinguished *Lakeside* from other cases, "based on the unique circumstances of each case." *Madison Consulting Group v. South Carolina*, 752 F.2d 1193, 1200-01 (7th Cir. 1985) (collecting cases). *Lakeside* has never been overruled, though, and there are some similarities between *Lakeside* and this case. Namely, WRMC caused the actions to be taken by signing the authorization from Citadel, and it retained no control over whom Citadel could hire. However, the case is easily distinguishable from *Lakeside* on two grounds. First, the nature of the contract is entirely different. *Lakeside's* contract was to complete a discrete task: to make and ship structural

assemblies. Second, the West Virginia company did not have continuing obligations and contacts with the Wisconsin corporation; they only needed to accept and pay for the assemblies. The contract in this case was for Citadel to provide a service; Citadel was to undertake "project development" in preparation for the construction of a medical office building. (The authorization is not particularly detailed regarding the extent of "project development," but we are not concerned with analyzing the *scope* of the parties' obligations at this juncture.) While the formation of the contract alone is not sufficient to confer personal jurisdiction on WRMC, the parties had continuing obligations and repeated contacts from the authorization's signing in September 2005 to WRMC's decision not to proceed in May 2006. At some point, a party's contacts must cross the threshold from offending due process to sufficient minimum contacts. WRMC's contacts have reached that point.

The district court concluded and WRMC argues that, like *Sungard*, the focus here should be on the property that the contract is centered on and not on the administrative services provided in Illinois. In *Sungard*, the purpose of the contract was for business continuity services in Tennessee, and the administrative services were incidental. Here, while the end result would have been construction of a building in Arkansas, the authorization was not for Citadel to begin construction. The authorization encompassed *only* project development, which consisted entirely of administrative services carried out (for the most part) in Illinois. Citadel took steps on WRMC's behalf, with WRMC's authorization, to procure the necessary prerequisites to constructing a building, and so its actions were not the "unilateral activities" of a

party having some relationship with an out-of-state defendant. *Burger King*, 471 U.S. at 474. Although WRMC notes that it did not have the power to direct whom Citadel should hire, it did authorize Citadel to begin project development, it received a development calendar outlining the steps that Citadel would be taking, and it proceeded toward closing with Citadel from September 2005 to May 2006 with knowledge that the other entities were working on its behalf to complete the actions listed in the development calendar. It continued to have individually insignificant, but collectively important, contacts with Citadel. And although the parties had not finalized a long-term relationship yet, during the months prior to closing they were certainly contemplating that one would exist. We reiterate that we are not commenting on the scope of the authorization, which will likely be contested on remand; we are merely looking at the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 479.

Citadel has satisfied its burden of proof that WRMC engaged in sufficient minimum contacts. WRMC should have reasonably anticipated being haled into court in Illinois if Citadel ever claimed that WRMC had failed to pay for obligations incurred under the authorization: "[T]he Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Id.* at 474. Likewise, we conclude that it would comport with fair play and substantial justice for WRMC to be subject to personal jurisdiction in Illinois. The state has a strong interest in protecting Citadel and the other Illinois organizations that were engaged in the project development for WRMC, and

it is fair for WRMC to answer for any obligations it incurred in Illinois.

### III.  Conclusion

We conclude that Citadel satisfied its burden of making a prima facie showing of the existence of personal jurisdiction over WRMC in Illinois. We REVERSE and REMAND for proceedings consistent with this opinion.[5]

---

[5]  We do not express any opinion on WRMC's motion to transfer venue for the convenience of the parties and witnesses, which the district court previously denied as moot; however, the district court may want to revisit that issue in light of the disposition of this appeal.

---