In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2653

NORTHERN GRAIN MARKETING, LLC,

*Plaintiff-Appellant*,

*v.*

MARVIN GREVING,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 3:12-cv-50067 — **Philip G. Reinhard**, *Judge*.

ARGUED JUNE 4, 2013 — DECIDED FEBRUARY 18, 2014

Before FLAUM, SYKES, and HAMILTON, *Circuit Judges*.

SYKES, *Circuit Judge*. Marvin Greving has lived and farmed in southeastern Wisconsin since April 1971. In 2003 he began contracting to sell his grain to Northern Grain Marketing, LLC, an Illinois-based grain buyer. Northern Grain claims that Greving repudiated several contracts formed years after the parties first began contracting and seeks almost $1 million in

damages from him. When Greving refused to arbitrate the dispute, Northern Grain filed this action in the district court in Rockford, Illinois, seeking an order compelling arbitration. Greving moved to dismiss for lack of personal jurisdiction. The court granted that motion and Northern Grain took this appeal.

We affirm. Greving lacks minimum contacts with Illinois that would permit the district court, consistent with the due-process clause of the Fourteenth Amendment, to exercise specific personal jurisdiction over him. As relevant to this dispute, Greving only set foot in Illinois once—to attend a seed-corn meeting in Rochelle in early 2003, several months before the parties entered into the first of their grain contracts. It was there that he met Tom Wilson, who became his point of contact with Northern Grain. But even assuming that Greving's attendance at this seed-corn meeting enters the personal-jurisdiction calculus for the later-formed contracts at issue here, there is no indication in the record that Greving attended the meeting in an effort to find grain buyers. And virtually everything else about Greving's contractual relation-ship with Northern Grain was based in Wisconsin. When Greving met with Wilson, they met either at his Wisconsin farm or at a Denny's restaurant in Delavan, Wisconsin. Greving delivered his Wisconsin-grown grain to a grain elevator in Wisconsin. Of course, the checks he received from Northern Grain were drawn on Illinois banks, but that does not show that he purposefully availed himself of the privilege of conducting business in Illinois. So although it may seem convenient as a practical matter for Greving to defend this suit in Rockford, the Constitution doesn't permit the Illinois

courts—and, thus, federal district courts in Illinois—to exercise jurisdiction over him.

## I. Background

Marvin Greving is a longtime Wisconsinite. Although he graduated from high school in Iowa and attended college in New York, he has lived and farmed in Walworth County, in rural southeastern Wisconsin, since April 1971, and has owned his own farm in Elkhorn since 1977. He and his wife conduct their personal and business activities in Wisconsin, and their children attended Wisconsin schools. Greving has a Wisconsin driver's license, Wisconsin insurance, and pays taxes into the Wisconsin treasury. He purchases his seed, fertilizer, pesticides, and other farm equipment from Wisconsin vendors.

In 2003 Greving traveled some 70 miles from his farm to attend a seed-corn meeting held at an insurance agency in Rochelle, Illinois. This was essentially a trade show sponsored by a seed company at which farmers could learn more about the latest technology in seed corn. While there, Greving met Wilson, a grain originator for Northern Grain.[1] Northern Grain is a limited-liability company organized under Delaware law but located in Harmon, Illinois. It buys and markets grain, and Wilson's job duties included contracting with farmers for the purchase of grain. While it appears that Wilson attended the seed-corn meeting for the purpose of making contacts with

---

[1] Actually, Wilson was a grain originator at Harmon Grain, LLC, Northern Grain's predecessor entity.

farmers like Greving, there is no indication that Greving attended the meeting with an eye toward marketing his own grain to buyers.

Wilson's efforts paid off. He and Greving kept in touch by phone after the meeting, and eventually Greving agreed to sell grain to Northern Grain. At the time of initial contracting, Greving knew that Northern Grain was located in Illinois. Greving and Northern Grain, via Wilson, entered into a series of similar contracts over the course of the next nine years or so. When Greving and Wilson met, they did so at a Denny's restaurant in Delavan, Wisconsin, or at Greving's farm. The typical contracting process involved an oral agreement followed by a written confirmation. Northern Grain would pay Greving by checks drawn on Illinois banks. Pursuant to the terms of the contracts, Greving produced the grain and delivered it to one of several Wisconsin grain elevators.

Northern Grain alleges that Greving repudiated several oral contracts providing for the delivery of grain between December 2010 and December 2012. Greving denies ever having entered into these contracts and claims that he had to continuously fend off Wilson's efforts to get him to sign documents purporting to be written confirmations of these contracts. He claims that these alleged contracts involved quantities of grain greater than his farm had ever produced in a given year and that he resisted Wilson's efforts to get him to sign the documents despite assurances that Northern Grain would work with him in meeting the quantities and Wilson's protestation that he could get fired if Greving didn't sign. Greving did not sign any of the documents.

Each of the unsigned documents contains fine-print provisions stating that (1) disputes would be subject to arbitration by the National Grain and Feed Association ("NGFA"); and (2) Greving would be obligated to cover Northern Grain's efforts to enforce the contract, including its costs and reasonable attorney's fees, plus compound interest at the rate of 18% per annum.

In November 2011 Greving received a copy of an arbitration complaint that Northern Grain had filed with the NGFA. Shortly thereafter, he received a letter that included a proposed Arbitration Services Contract, which contained a provision stating that Greving would submit to arbitration by the NGFA. In January 2012 Greving, through counsel, responded to the letter and declined to submit to arbitration.

In February 2012 Northern Grain filed an action to compel arbitration in federal court in the Western Division of the Northern District of Illinois, located in Rockford. The complaint invoked the court's diversity jurisdiction. *See* 28 U.S.C. § 1332; *see also* Federal Arbitration Act, 9 U.S.C. § 4; *Vaden v. Discover Bank*, 556 U.S. 49, 59 (2009) (explaining that the relevant provision of the Federal Arbitration Act " 'bestow[s] no federal jurisdiction but rather requir[es] [for access to a federal forum] an independent jurisdictional basis' over the parties' dispute." (alterations in original) (quoting *Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 581–82 (2008)). In the underlying claim, Northern Grain seeks almost $1 million in damages plus interest, costs, and attorney's fees.

A few days after this action was filed, the district court required Northern Grain to amend its jurisdictional allegations

to identify the principal place of business of its member corporations, which Northern Grain did on March 1, 2012. The summons wasn't issued for two more weeks and wasn't returned executed until March 28, 2012. In the meantime, and before learning of Northern Grain's federal-court lawsuit, Greving independently filed suit in Wisconsin state court seeking, among other relief, a declaration that the dispute over the alleged contracts was not subject to arbitration and that the alleged contracts were invalid and unenforceable. He had company, too: Three Illinois farmers joined him as coplaintiffs.[2]

After being served by Northern Grain, Greving moved to dismiss the Illinois lawsuit. He asserted that the district court lacked personal jurisdiction over him, that venue was improper in Rockford, that Northern Grain had failed to state a claim, and that the "doctrine of abstention" required dismissal because he already had an action arising out of the same facts pending in Wisconsin state court. The district court dismissed the case on personal-jurisdiction grounds without addressing Greving's other arguments, and Northern Grain took this timely appeal. Neither party urges us to reach the other issues raised in Greving's motion; personal jurisdiction is the sole issue.

---

[2] Greving says he joined with these Illinois farmers in filing a lawsuit because they had similar claims and thus wanted to "minimize the expense and inconvenience of multiple lawsuits that arise out of the same facts and raise common issues." Of course, the presence of Illinois farmers in the lawsuit also would have prevented Northern Grain from removing the case to the U.S. District Court for the Eastern District of Wisconsin based on diversity of citizenship. Greving informs us that his coplaintiffs' claims have been resolved but the rest of the state-court suit remains pending.

## II. Discussion

We review a dismissal for lack of personal jurisdiction de novo. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002) (citing *Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 52 (7th Cir. 1996)). The plaintiff bears the burden of establishing personal jurisdiction when the defendant challenges it. *Purdue Res. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). Where, as here, the district court rules on a defendant's motion to dismiss based on the submission of written materials without holding an evidentiary hearing, the plaintiff " 'need only make out a *prima facie* case of personal jurisdiction.' " *Id.* (quoting *Hyatt*, 302 F.3d at 713). We resolve factual disputes in the plaintiff's favor when evaluating whether that showing has been made, *id.*, though in the present case, the facts material to the personal-jurisdiction question are undisputed.

Personal jurisdiction refers to a court's "power to bring a person into its adjudicative process." BLACK'S LAW DICTIONARY 930 (9th ed. 2009). A federal district court's personal jurisdiction over a defendant is established in a diversity-jurisdiction case when the plaintiff serves the defendant with a summons or files a waiver of service, but only so long as the defendant is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located—here, Illinois. FED. R. CIV. P. 4(k)(1)(A). Illinois law permits its courts to exercise jurisdiction over a person "as to any cause of action arising from … (1) [t]he transaction of any business within [Illinois; or] … (7) [t]he making or performance of any contract or promise substantially connected with [Illinois]." 735 ILL. COMP. STAT. 5/2-209(a)(1), (7). Additionally, and more importantly,

Illinois state courts may exercise jurisdiction "on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." *Id.* § 5/2-209(c). Thus, the statutory question merges with the constitutional one—if Illinois constitutionally may exercise personal jurisdiction over a defendant, its long-arm statute will enable it to do so. *See Hyatt*, 302 F.3d at 714–15; *see also Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 536 F.3d 757, 760–61 (7th Cir. 2008) (discussing the relationship between the "catch-all" provision of the Illinois long-arm statute, the Illinois Constitution, and the U.S. Constitution).

The federal constitutional limits of a court's personal jurisdiction in a diversity case are found in the Fourteenth Amendment's due-process clause, *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 464 (1985), which "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations,' " *id.* at 471–72 (quoting *Int'l Shoe Co. v. Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 319 (1945)). A forum state's courts may not exercise personal jurisdiction over a nonconsenting, out-of-state defendant unless the defendant has "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). "The nature of the defendant's contacts with the forum state determines the propriety of personal jurisdiction and also its scope—that is, whether jurisdiction is proper at all, and if so, whether it is general or specific to the claims made in the case." *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th

Cir. 2010). If the defendant has " 'continuous and systematic' contacts with a state," the defendant is subject to general jurisdiction there in any action, even if the action is unrelated to those contacts. *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). Northern Grain doesn't contend that Greving is subject to the general jurisdiction of the Illinois courts, so we focus our analysis on the specific-jurisdiction inquiry.

To support an exercise of specific personal jurisdiction, the defendant's contacts with the forum state must "directly relate to the challenged conduct or transaction." *Id.* at 702 (citing *GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1024 (7th Cir. 2009)). "Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Id.* (citing *Burger King*, 471 U.S. at 472); *see also Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (explaining that there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State"). The exercise of specific jurisdiction must also comport with traditional notions of fair play and substantial justice. *Tamburo*, 601 F.3d at 702 (citing *Int'l Shoe*, 326 U.S. at 316).

The defendant's conduct and connection with the forum state must be substantial enough to make it reasonable for the defendant to anticipate that he could be haled into court there. *Burger King*, 471 U.S. at 474. This purposeful-availment requirement ensures that a defendant's amenability to

jurisdiction is not based on "random, fortuitous, or attenuated contacts," *id.* at 475 (internal quotation marks omitted), but on contacts that demonstrate a real relationship with the state with respect to the transaction at issue, *see Purdue Res. Found.*, 338 F.3d at 780.

> To this end, the Supreme Court repeatedly has asked whether the defendant has deliberately engaged in significant activities within the forum state, *see Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984)[;] *Kulko v. California Superior Ct.*, 436 U.S. 84, 94–95 (1978), or whether it has created continuing obligations between itself and a resident of the forum, *see Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 648 (1950).

*Id.* at 780–81 (parallel citations omitted).

With respect to contract disputes, "contracting with an out-of-state party alone cannot establish automatically sufficient minimum contacts in the other party's home forum." *Purdue Res. Found.*, 338 F.3d at 781 (citing *Burger King*, 471 U.S. at 478). Instead, we conduct a context-sensitive analysis of the contract, examining "prior negotiations, contemplated future consequences, the terms of the contract, and the parties' course of actual dealing with each other." *Id.* (citing *Burger King*, 471 U.S. at 479). So long as a commercial defendant's efforts are purposefully directed toward residents of the forum state, the fact that the defendant hasn't physically entered it does not defeat personal jurisdiction there. *Burger King*, 471 U.S. at 476.

For example, in *Madison Consulting Group v. South Carolina*, 752 F.2d 1193 (7th Cir. 1985), we upheld personal jurisdiction in Wisconsin where South Carolina defendants initiated a contractual relationship with the plaintiff consulting firm based in Madison, Wisconsin. We held that the defendants purposefully availed themselves of the privilege of conducting business in Wisconsin by (1) placing a phone call to the Wisconsin firm to initiate the negotiations; (2) paying for a partner from the Wisconsin firm to fly to Washington, D.C., to discuss the consulting project; (3) mailing a copy of the contract to Wisconsin; and (4) knowing that the consulting firm would complete most of the work in Madison. *Id.* at 1194–95. We reasoned that "[t]he question of which party initiated or solicited a business transaction has long been considered pertinent to the constitutional propriety of personal jurisdiction in a suit arising out of the transaction." *Id.* at 1202. Since the defendants not only initiated the negotiations but also induced one of the plaintiff's agents to travel across the country, we deemed the defendants to be "actively reaching out to solicit the services of a Wisconsin partnership" and held that this sufficed for minimum-contacts purposes. *Id.* at 1203.

In arriving at this decision, we distinguished *Lakeside Bridge & Steel Co. v. Mountain State Construction Co.*, 597 F.2d 596 (7th Cir. 1979). There we found that Wisconsin lacked personal jurisdiction over a West Virginia-based defendant who ordered "structural assemblies" from the Wisconsin-based plaintiff without ever having set foot in Wisconsin. *Id.* at 598. We recognized that although the performance of the contract would take place primarily within Wisconsin, the contract negotiations and acceptance took place via mail, and "the

contacts with Wisconsin … consist[ed] solely of the unilateral activity of" the Wisconsin-based plaintiff; no other circumstances indicated that the West Virginia company purposefully availed itself of the privilege of conducting activities within Wisconsin. *Id.* at 603 (internal quotation marks omitted).

*Lakeside* has been on the receiving end of a good bit of distinguishing analysis, and even criticism, in the years since it was decided. *See Citadel Grp.*, 536 F.3d at 763 ("[T]his court has frequently distinguished *Lakeside* from other cases, based on the unique circumstances of each case." (internal quotation marks omitted)); *Madison Consulting Grp.*, 752 F.2d at 1205 (Swygert, J., concurring in the result). Much of the criticism is focused on *Lakeside*'s apparent disregard of the important fact that the plaintiff performed the contract in the forum state at the defendant's bidding, a relevant fact under subsequent Supreme Court precedent. *See Burger King*, 471 U.S. 462 (finding minimum contacts with the forum state where the defendant entered into a franchise contract with a corporation headquartered in the forum state, even though his restaurant was on the other side of the country and he interacted primarily with a district office nearer to his restaurant). Still, *Lakeside* "has never been overruled." *Citadel*, 536 F.3d at 763. Our decision in *Madison Consulting Group* treats *Lakeside* as marking something of a borderline for a no-jurisdiction finding: "[W]hen a defendant's contacts with the forum state have been as—if not more—limited than those of the defendant in *Lakeside*, this court has denied personal jurisdiction." 752 F.2d at 1200.

Our case is readily distinguishable from *Madison Consulting Group*, which turned heavily on the fact that the South Carolina defendants not only initiated contact with the Wisconsin-based consulting firm, but also provided for one of its partners to fly to Washington, D.C., for a meeting. Here, there is no indication that Greving initiated this business relationship at all, let alone facilitated it through the expenditure of money. Even assuming that Greving's attendance at the Illinois seed-corn meeting bears on the personal-jurisdiction analysis in this case,[3] he did so without any apparent intent to solicit business there. Nothing in the record suggests that his meeting Wilson there was anything other than fortuitous on his part. (Of course, Wilson was there for the purpose of soliciting clients, but that is the type of unilateral activity by the plaintiff that doesn't factor into the personal-jurisdiction analysis.) Indeed, Northern Grain does not dispute that it was Wilson who "would propose that [Greving] sell certain quantities of [grain]." And of course the contract was performed entirely in Wisconsin rather than

---

[3] Given that we evaluate specific personal jurisdiction by reference to "the particular conduct underlying the claims made in the lawsuit," *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010), it is by no means clear that Greving's attendance at the 2003 seed-corn meeting should impact our analysis at all. The contracts at issue here were allegedly formed years after 2003, with numerous intervening contracts separating Greving's initial meeting with Wilson from the contracts at issue here. Because the issue doesn't affect our bottom line—at best Greving's attendance at the seed-corn meeting can only be described as an attenuated contact with Illinois—we need not determine whether it constitutes part of the conduct underlying the claims in this lawsuit.

in the forum state. *Madison Consulting Group* doesn't dictate the result in this case.

Northern Grain also points us to *Logan Productions, Inc. v. Optibase, Inc.*, 103 F.3d 49 (7th Cir. 1996). There, we focused less on who initiated contact and more on whether the defendant manufacturer "intentionally served the [forum-state] market." *Id.* at 53. We concluded that since the California-based defendant had "advertised in trade magazines circulated in Wisconsin [the forum state]," signed up with a distributor in Wisconsin, and even conducted dealer training in Wisconsin, it had purposefully availed itself of the privilege of conducting activities in that state. *Id.* at 53. We pointed out that the defendant had said itself that it " 'wanted the business' of Wisconsin residents 'and knew how to earn it!' " *Id.* This was "not some little mom and pop retailer who passively sold only to those out-of-staters who happened to wander into its shop." *Id.* In contrast, here there is no evidence that Greving engaged in any advertising or distribution efforts in Illinois—instead, he's a farmer selling grain to a single buyer who markets the grain to others. Aside from contracting with and receiving money from this Illinois-based buyer—activities that Greving completed entirely from within the Badger State's borders—Greving has no relevant interaction with Illinois.

Nor does considering the " 'terms of the contract and the parties' actual course of dealing' " *Citadel Grp.*, 536 F.3d at 761 (quoting *Burger King*, 471 U.S. at 479), dictate a finding of personal jurisdiction. In *Citadel* we distinguished *Lakeside* on the ground that "*Lakeside*'s contract was to complete a discrete task: to make and ship structural assemblies[, whereas] … [t]he

contract in this case was for Citadel to provide a service." *Id.* at
763. Greving's contracts similarly involve a discrete task: to
grow and deliver grain in Wisconsin. They are more like the
manufacturing contract in *Lakeside*—described in *Citadel* as
involving no "continuing obligations," but instead requiring
the defendant purchaser only to "accept and pay for the
assemblies," *id.*—than the construction-project contract in
*Citadel*, which required the defendant not only to pay the
developer but also to stay in continuous contact with it during
the course of contract performance, at least as a practical
matter. Although we "do not recognize any inherent distinc-
tion between goods and services contracts for purposes of due
process," *Madison Consulting Grp.*, 752 F.2d at 1204, *Citadel*
recognizes that the dynamics of each type of contract may
affect the personal-jurisdiction analysis. Similarly, Supreme
Court cases involving contracts with continuing obligations to
the forum state—e.g., the franchise contract in *Burger King*,
471 U.S. at 480 (describing the contract as a "carefully struc-
tured 20-year relationship that envisioned continuing and
wide-reaching contacts with Burger King in Florida") and the
insurance contracts in *Travelers Health Ass'n*, 339 U.S. at 648
(describing the insurance certificates as being "systematically
and widely delivered" in the forum state and "creat[ing]
continuing obligations" between the insurer and the insurance
holders)—are inapposite to the series of discrete contracts at
issue here, each of which was performed once by delivery on
a specified date and, so far as the record reveals, involved no
further obligations on Greving's part.

Focusing on the negotiations preceding each contract
doesn't help Northern Grain. Unlike *Wisconsin Electrical*

*Manufacturing Co. v. Pennant Products, Inc.*, 619 F.2d 676 (7th Cir. 1980), where the meetings leading to contract formation were held in the forum state, *see id.* at 677, Greving and Wilson discussed their contracts in Wisconsin or over the phone. *NUCOR Corp. v. Aceros y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572 (7th Cir. 1994), is distinguishable for the same reason. There, prior telephone negotiations led the defendant's general manager to meet with two other corporate officers in the forum state to "discuss in detail the purchase of secondary steel with [the plaintiff's] sales manager at the [the plaintiff's] plant." *Id.* at 580. In the present case, the preliminary negotiations leading to the first contract were conducted remotely and called for Greving to produce and deliver grain in Wisconsin, not in Illinois.

Ultimately, our case seems to be closest to *Lakeside*—indeed, it involves even fewer contacts with the forum state than were present in that case. In *Lakeside* a contract initiated remotely by the defendant required the forum-state plaintiff to manufacture industrial parts; we held that the defendant wasn't subject to personal jurisdiction in that state. Here, the contracts at issue were formed remotely or in the nonforum state, and they required the defendant to deliver grain grown in the nonforum state to a grain elevator also located in the nonforum state. The case against personal jurisdiction is stronger here.

We recognize that Greving didn't just have one contract for a discrete delivery of grain. He recontracted with Northern Grain from time to time for about nine years. And he did this knowing that Northern Grain was based in Illinois. But it is well established that an individual's contract with an out-of-

state party doesn't suffice on its own to establish sufficient minimum contacts in the other party's home forum. *See Burger King*, 471 U.S. at 478. And the nature of the particular contractual relationship here belies the idea that Greving had sufficient contacts with Illinois to support personal jurisdiction in that state. Greving's contractual duty was to grow his grain on his Wisconsin farm and deliver it to a Wisconsin grain elevator. Northern Grain's duty was simply to compensate Greving for the grain. Greving wasn't actively marketing his grain to other Illinois companies; he just happened to get acquainted with Wilson at the seed-corn trade meeting in Illinois. It was several months before Wilson's negotiations with Greving in Wisconsin ripened into the first contract with Northern Grain. Moreover, the record gives no indication that Greving knew (or cared) what Northern Grain did with his grain after each sale. That distinguishes this situation from the one in which a seller-defendant is actively marketing products in the buyer-plaintiff's home state. *See Giotis v. Apollo of the Ozarks, Inc.*, 800 F.2d 660, 667 (7th Cir. 1986) (explaining that personal jurisdiction in the buyer-plaintiff's home state is often appropriate in such situations). Greving did not purposefully avail himself of the privilege of conducting business in Illinois.

Because Northern Grain has failed to show that Greving has sufficient minimum contacts with Illinois, we need not go further in the personal-jurisdiction analysis by, for example, analyzing whether requiring Greving to defend the suit in Rockford offends " 'traditional notions of fair play and substantial justice.' " *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken*, 311 U.S. at 463). The district court correctly determined that it lacked personal jurisdiction over Greving in this case.

AFFIRMED.